# EXHIBIT B

THIS OPINION IS NOT A
PRECEDENT OF THE TTAB

Mailed: February 3, 2026

UNITED STATES PATENT AND TRADEMARK OFFICE
————

Trademark Trial and Appeal Board
————

*Airbnb, Inc.*
*v.*
*Soul BnB LLC*
————

Opposition No. 91288785

————

Christopher T. Varas and Jennifer Fairbairn Deal of Kilpatrick Townsend &
    Stockton LLP, for Airbnb, Inc.

Soul BnB LLC, pro se (by Christopher D. Foreman, CEO).
————

Before Wellington, Pologeorgis, and Lavache,
    Administrative Trademark Judges.

Opinion by Lavache, Administrative Trademark Judge:

Applicant Soul BnB LLC filed an application seeking registration on the Principal

Register of the standard character mark **SOUL BNB** for "Health spa services for

health and wellness of the mind, body and spirit offered in or from a remote, mobile

or temporary on-site location," in International Class 44.[1]

---

[1] Application Serial No. 97637496, filed October 18, 2022, claiming a bona fide intention to
use the mark in commerce, under Trademark Act Section 1(b), 15 U.S.C. § 1051(b).

Opposition No. 91288785

Opposer Airbnb, Inc. opposes registration of Applicant's mark on the ground of likelihood of confusion under Trademark Act Section 2(d), 15 U.S.C. § 1052(d), based on its ownership of eight pleaded registrations for the standard character mark **AIRBNB**,[2] for various goods and services in International Classes 9, 35, 36, 39, 42, 43, and 45, as summarized below:

| Reg. No. | Reg. Date | Goods/Services |
|---|---|---|
| 3890025 | 12/14/2010 (renewed) | Providing online business directories featuring temporary lodging, in International Class 35. |
| 3890027 | 12/14/2010 (renewed) | Arranging temporary housing accommodations; Providing online reservation services for temporary lodging; Travel agency services, namely, . . . lodging; Providing temporary lodging information via the Internet, in International Class 43. |
| 3971784 | 5/31/2011 (renewed) | Computer services in the nature of customized web pages featuring user-defined information, personal profiles and information, in International Class 42. |
| 4289397 | 2/12/2013 (renewed) | Providing an online interactive website featuring the listing and rental of temporary lodging; Providing online computer database and online searchable databases featuring information, listings and announcements about housing, apartments, condominiums, townhouses, real estate, and rental and leasing advertisements for the foregoing; Real estate listing, rental and leasing services for residential housing, apartments, rooms in homes, sublets, vacation homes, cabins and villas on a global computer network; Providing reviews and feedback about listers and renters of real estate, in International Class 36; |
| | | Computer services, namely, creating an on-line community for registered users to participate in discussions, get feedback from their peers, form virtual communities, and engage in social networking featuring the rental and listing of real estate, in International Class 42; |

---

[2] *See* Notice of Opposition, 1 TTABVUE 1, 19-98; Opposer's First Notice of Reliance, 10 TTABVUE 10-92. The Notice of Opposition also listed "Common Law Basis" and "Dilution by blurring" as grounds for opposition. 1 TTABVUE 1. However, because Opposer's brief contains no arguments as to these claims, they are waived. *See Monster Energy Co. v. Chun Hua Lo*, No. 91225050, 2023 TTAB LEXIS 14, at *3-4 (deeming opposer's lack of bona fide intent to use claim waived because it was not argued in opposer's brief).

The "TTABVUE" citations in this opinion refer to entries in the Board's electronic docket. The number preceding "TTABVUE" is the docket entry number and any numbers following indicate the relevant page numbers within the docket entry. *See, e.g., Turdin v. Trilobite, Ltd.*, No. 94002505, 2014 TTAB LEXIS 17, at *6 n.6.

Opposition No. 91288785

| | | |
|---|---|---|
| | | On-line social networking services, in International Class 45. |
| 4329542 | 4/30/2013 (renewed) | Online trip and travel recommendations and reservation services; Providing travel information over global computer networks, namely, providing search services for travel listings, travel information and related topics and for making reservations and bookings for transportation; Providing reviews and recommendations of local attractions via a global computer network, in International Class 39;<br><br>Providing travel information over global computer networks, namely, providing search services for travel listings, travel information and related topics and for making reservations and bookings for lodging, in International Class 43. |
| 4385613 | 8/13/2013 (renewed) | Providing an online interactive website obtaining users comments concerning business organizations, service providers, and travel and social activities; Providing information, namely, compilations, rankings, ratings, reviews, referrals and recommendations relating to business organizations, service providers, and travel and social activities using a global computer network; Advertising and promotion services and related consulting; dissemination of advertising for others via a global communications network; online advertising services for others, namely, providing advertising space on internet web sites; Providing a searchable online advertising guide featuring the goods and services of online vendors; providing a searchable online evaluation database for buyers and sellers; promoting the goods and services of others; advertising and advertisement services; advertising and information distribution services, namely, providing classified advertising space via the global computer network; providing consumer product and service information via the Internet; providing an online business information directory on the Internet; providing on-line computer databases and on-line searchable databases featuring classified listings; computer services, namely, providing on-line computer databases and on-line searchable databases featuring consumer information on a wide variety of topics of general interest to the consuming public, in International Class 35. |
| 4884815 | 1/12/2016 (maintained) | Vacation real estate listing services and providing such services via a global computer network; Real estate listing services, namely, providing an interactive website and online database of rental properties, rental information, rental property descriptions and images, rental locations and amenities, availability and rates for vacation rental homes, condominiums, cabins, villa, apartments, and time-shares; Real estate services, namely, arranging of rental agreements for real estate for others by through a website where users can post and receive requests to rent short-term houses, condos, and apartments, in International Class 36;<br><br>Providing a website for the arrangement and booking of travel tours and excursions; Providing a website featuring travel information and commentary; Providing an online searchable computer database featuring information on travel; Providing reviews of travel service providers; Travel guide and travel information services; Travel agency |

3

Opposition No. 91288785

| | | |
|---|---|---|
| | | services, namely, making reservations and bookings for transportation, excursions, travel tours and travel, in International Class 39;<br><br>Providing online reservation, booking and search services for temporary lodging, temporary accommodations and temporary vacation rentals; Providing an online interactive website featuring temporary lodging, temporary accommodations, temporary vacation rentals and temporary rental listings; Providing a website featuring information in the field of temporary lodging, temporary accommodations and temporary vacation rentals; Travel agency services, namely, making reservations and bookings for temporary lodging, temporary accommodations and temporary vacation rentals; Providing rental information for temporary lodging, temporary accommodations and temporary vacation rentals, namely, property descriptions and images, reviews, locations and amenities, availability and rates for temporary lodging, temporary accommodations and temporary vacation rentals, in International Class 43. |
| 4983513 | 6/21/2016 (maintained) | Computer application messaging software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software that allows users to communicate with each other; computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software that allows messaging among guests of lodging accommodations owned and hosted by others and among the hosts who list lodging accommodations for rent[;] computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software that allows users to plan, announce, invite others to attend and evaluate real world meetings and events; computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software that allows users to solicit each other to perform a wide range of personal and customized services, personalized travel, itinerary and private tour and activity services; computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software that allows users to arrange for the remote exchange of keys to lodgings, homes and for locking and unlocking lodgings homes[;] computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software management tools to permit users to manage, organize, calendar and share with others travel bookings, activity dates, photographs, opinions and preferences; computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software management tools to permit users to arrange for temporary lodging check-in help; computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software that permits listers of goods, real property and services for rent or sale to receive suggested improvements to their listing advertisements; computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software that permits listers of goods, real property and services for rent or sale to arrange for professional photographs of the listed goods, |

4

Opposition No. 91288785

| | | |
|---|---|---|
| | | property and services; computer application software for mobile phones, portable media players, handheld computers and related mobile devices; computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software to facilitate the sale of goods and services by others via a computer network and to provide evaluative feedback and ratings of sellers' goods and services, the value and prices of sellers' goods and services, buyers' and sellers' performance, delivery, and overall trading experience in connection therewith; computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software that allows users to list and rent temporary lodging, access information, listings and announcements about housing, apartments, condominiums, townhouses, real estate, and rental and leasing advertisements for the foregoing; computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software that allows users to provide reviews and feedback about listers and renters of real estate, temporary lodging, transportation, and temporary parking; computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software that allows users to make and receive payments for the rental, purchase and sale of goods and services; computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software that allows users to search for travel, transportation, temporary accommodation, and temporary vehicle parking listings, travel information and related topics and for making reservations and bookings for transportation, temporary accommodations, and temporary parking; computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software that allows users to provide travel reviews and recommendations for local attractions; computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software that allows vehicle owners and users to list [sic] [;] computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software that allows users to list, arrange and reserve temporary parking of vehicles at residences; computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software that allows users to list temporary parking; computer application software for mobile phones, portable media players, handheld computers and related mobile devices, namely, software that allows users to engage in social networking featuring travel, transportation, temporary lodging, temporary parking and the rental and listing of real estate, in International Class 9. |

Applicant's answer denies most of the allegations in the notice of opposition, but admits, in relevant part, that Opposer is "a San Francisco-based company providing an online marketplace for accommodations and experiences"; that "the term

5

Opposition No. 91288785

'AIRBNB' has no ordinary English language meaning"; that Opposer owns "numerous U.S. registrations and applications for 'AIRBNB'"; and that Applicant's "application contains no restrictions on trade channels."[3]

Opposer filed a trial brief,[4] but Applicant did not. Nor did Applicant submit any evidence during its assigned trial period.[5] For the reasons explained below, the opposition is **dismissed**.

## I. The Record

The record includes the pleadings, the submissions of the parties during their respective trial periods, and, by rule, Applicant's involved application file. *See* Trademark Rule 2.122(b)(1), 37 C.F.R. § 2.122(b)(1). Although we do not specifically itemize the contents of the record, it has been reviewed and considered in its entirety.[6] *See Quiktrip W., Inc. v. Weigel Stores, Inc.*, 984 F.3d 1031, 1036 (Fed. Cir. 2021) ("We have held 'on multiple occasions that failure to explicitly discuss every issue or every

---

[3] Applicant's Answer, 4 TTABVUE 2-4. In response to Opposer's first request for admission, Applicant also admitted that it was aware of Opposer and Opposer's marks when Applicant adopted Applicant's mark and when Applicant filed the application for Applicant's mark. *See* Opposer's Fourth Notice of Reliance, 22 TTABVUE 49 (Applicant's Response to the First Request for Admissions). Applicant otherwise denied the allegations in the first and second requests for admission. *Id.* at 42-51 (Response to First Request for Admission), 60-65 (Response to Second Request for Admission).

[4] Opposer's Brief, 25 TTABVUE.

[5] Because the burden of proof resides with Opposer, Applicant was not required to submit any evidence or file a brief. *See Shenzhen IVPS Tech. Co. v. Fancy Pants Prods., LLC*, No. 91263919, 2022 TTAB LEXIS 383, at *5 (citing *Yazhong Investing Ltd. v. Multi-Media Tech. Ventures, Ltd.*, 2018 TTAB LEXIS 168, at *12 n.13 ("Because Respondent, as defendant herein, is under no obligation to submit evidence or a brief, we do not construe Respondent's failure to do so as a concession of the case.")

[6] The record includes a stipulation of facts signed by both parties, which was filed by Opposer on February 18, 2025. *See* 19 TTABVUE (public filing). The Board had not previously approved this stipulation; we do so here. *See generally* TBMP § 501.

6

Opposition No. 91288785

piece of evidence does not alone establish that the tribunal did not consider it.'"

(quoting *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1328 (Fed. Cir. 2017)));

*In re Miracle Tuesday LLC*, 695 F.3d 1339, 1348 (Fed. Cir. 2012) ("[T]he mere fact

that the Board did not recite all of the evidence it considered does not mean the

evidence was not, in fact, reviewed." (citing *Plant Genetic Sys., N.V. v. Dekalb

Genetics Corp.*, 315 F.3d 1335, 1343 (Fed. Cir. 2003))).[7]

In our analysis below, we have cited any evidence we have credited, and we have

given no weight to factual assertions that are not supported by evidence properly

introduced into the record. *See Pierce-Arrow Soc'y v. Spintek Filtration, Inc.*, No.

91224343, 2019 TTAB LEXIS 388, at *9.

## II.  Opposer's Entitlement to a Statutory Cause of Action

Establishing an entitlement to a statutory cause of action is a threshold

requirement in every inter partes case. *See Corcamore, LLC v. SFM, LLC*, 978 F.3d

1298, 1303 (Fed. Cir. 2020); *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM,

LLC*, 965 F.3d 1370, 1373 (Fed. Cir. 2020). Thus, Opposer, as plaintiff in this

opposition proceeding, must prove its entitlement to a statutory cause of action by a

preponderance of the evidence. *See, e.g.*, *Made in Nature, LLC v. Pharmavite LLC*,

No. 91223352, 2022 TTAB LEXIS 228, at *8.

---

[7] The record contains a document captioned "Notice of Civil Action filed in Cancellation No. 92083886." 27 TTABVUE. As the name of the document suggests, it provides notice that Opposer initiated a de novo appeal in district court concerning a prior decision of the Board involving Opposer's petition to cancel Registration No. 6421453 for the mark COMPLETE BNB. *See id.* The relevance of the district court action to this proceeding is unclear and Opposer has not provided any explanation on that point. Therefore, we do not take any further action regarding the notice other than to acknowledge receipt of it.

7

Opposition No. 91288785

To establish an entitlement to a statutory cause of action, Opposer must demonstrate that it has: (1) an interest falling within the zone of interests protected by the statute, and (2) a reasonable belief in damage proximately caused by the registration of the mark. *Curtin v. United Trademark Holdings, Inc.*, 137 F.4th 1359, 1367 (Fed. Cir. 2025) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-134 (2014)); *Corcamore*, 978 F.3d at 1304-07; *see also Made in Nature*, 2022 TTAB LEXIS 228, at *18.

Here, Opposer has submitted printouts from USPTO records showing the current status and title of Opposer's pleaded registrations.[8] These registrations form the basis of a likelihood-of-confusion claim that is not wholly without merit, demonstrating both an interest falling within the zone of interests protected by the Trademark Act and a reasonable belief in damage proximately caused by the registration of Applicant's mark. Therefore, Opposer has established its entitlement to oppose Applicant's application. *N.Y. Yankees P'ship v. IET Prods. & Servs., Inc.*, No. 91189692, 2015 TTAB LEXIS 96, at *8 ("Opposer's standing is established with respect to its likelihood of confusion and dilution claims by its . . . registrations . . . which the record shows to be valid and subsisting, and owned by Opposer.") (citing *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000)); s*ee also Corcamore*, 978 F.3d at 1306.

---

[8] Notice of Opposition, 1 TTABVUE 19-98; Opposer's First Notice of Reliance, 10 TTABVUE 10-92.

8

Opposition No. 91288785

## III. Priority

Because Opposer's valid and subsisting registrations are properly of record and Applicant has not counterclaimed to cancel them, priority is not an issue for Opposer's claimed mark and the goods and services identified in the registrations. *Heil Co. v. Tripleye GmbH*, No. 91277359, 2024 TTAB LEXIS 494, at *44 (citing *King Candy, Inc. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 1402-03 (CCPA 1974)); *Nkanginieme v. Appleton*, No. 91256464, 2023 TTAB LEXIS 64, at *4 ("Opposer's registration removed priority as an issue.").

## IV. Likelihood of Confusion

We now turn to Opposer's likelihood-of-confusion claim. Trademark Act Section 2(d), in relevant part, prohibits registration of a mark that "so resembles a mark registered in the Patent and Trademark Office . . . as to be likely, when used on or in connection with the goods [or services] of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d). Opposer bears the burden of establishing that there is a likelihood of confusion by a preponderance of the evidence. *Cunningham*, 222 F.3d at 951. To determine whether confusion is likely, we analyze all probative evidence relevant to the factors set out in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973) ("*DuPont*"). *See In re Majestic Distilling Co.*, 315 F.3d 1311, 1315 (Fed. Cir. 2003).

In every Section 2(d) case, two key *DuPont* factors are the similarity or dissimilarity of the marks and the relatedness of the respective goods or services, because the "fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods [or services] and differences

9

Opposition No. 91288785

in the marks." *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 1103 (CCPA 1976). Here, we have considered these *DuPont* factors, as well as any other factors that are relevant and for which there is evidence and argument of record. *See In re Guild Mortg. Co.*, 912 F.3d 1376, 1379 (Fed. Cir. 2019).

Varying weights may be assigned to each *DuPont* factor depending on the evidence presented. *See Citigroup Inc. v. Cap. City Bank Grp. Inc.,* 637 F.3d 1344, 1356 (Fed. Cir. 2011); *In re Shell Oil Co.*, 992 F.2d 1204, 1205 (Fed. Cir. 1993) ("[T]he various evidentiary factors may play more or less weighty roles in any particular determination."). Ultimately, however, "each case must be decided on its own facts and the differences are often subtle ones." *Indus. Nucleonics Corp. v. Hinde*, 475 F.2d 1197, 1199 (CCPA 1973).

### A.  Focus on Certain Pleaded Registrations

Opposer pleaded ownership of eight prior registrations, all for the standard character mark AIRBNB, but Opposer's arguments rely mainly on the following registrations and, in some instances, certain services listed within these registrations:[9]

- Registration No. 3890025: Providing online business directories featuring temporary lodging," in International Class 35;[10]

- Registration No. 3890027: "Arranging temporary housing accommodations; Providing online reservation services for temporary lodging; Travel agency services, namely, . . . lodging; Providing temporary lodging information via the Internet," in International Class 43;[11]

---

[9] *See* Opposer's Brief, 25 TTABVUE 24, 35.

[10] Opposer's First Notice of Reliance, 10 TTABVUE 11.

[11] *Id.* at 13.

Opposition No. 91288785

- Registration No. 4329542: "Online trip and travel recommendations and reservation services; Providing travel information over global computer networks, namely, providing search services for travel listings, travel information and related topics and for making reservations and bookings for transportation; Providing reviews and recommendations of local attractions via a global computer network," in International Class 39;[12] and

- Registration No. 4884815: "Providing a website for the arrangement and booking of travel tours and excursions; Providing a website featuring travel information and commentary; Providing an online searchable computer database featuring information on travel; Providing reviews of travel service providers; Travel guide and travel information services; Travel agency services, namely, making reservations and bookings for transportation, excursions, travel tours and travel," in International Class 39.[13]

Our opinion likewise focuses on these particular registrations and services, as we agree that they are the most relevant to our Section 2(d) analysis.[14] If we do not find a likelihood of confusion with respect to the services in these registrations, then we would not find a likelihood of confusion as to the remaining registrations. *Cf., e.g.*, *Sock It To Me, Inc. v. Fan*, No. 91230554, 2020 TTAB LEXIS 201, at *20-21 (confining Section 2(d) analysis to most similar pleaded mark) (citing *N. Face Apparel Corp. v. Sanyang Indus. Co.*, No. 91187593, 2015 TTAB LEXIS 328, at *20-21).

### B. Relatedness of the Services

We begin our analysis with the second *DuPont* factor, which concerns the similarity or dissimilarity and nature of the respective services, i.e., the relatedness of the services. *DuPont*, 476 F.2d at 1361. When considering this factor, we look to

---

[12] *Id.* at 19.

[13] *Id.* at 21.

[14] We also note that there is some overlap between the various registrations, as they include some identical or similar services.

11

Opposition No. 91288785

the services as identified in Applicant's application and the services listed in Opposer's registrations. *See Stone Lion Cap. Partners, LP v. Lion Cap. LLP*, 746 F.3d 1317, 1323 (Fed. Cir. 2014) (quoting *Octocom Sys., Inc. v. Hous. Comput. Servs. Inc.*, 918 F.2d 937, 942 (Fed. Cir. 1990)).

Here, Applicant's services are "health spa services for health and wellness of the mind, body and spirit offered in or from a remote, mobile or temporary on-site location," in International Class 44. Opposer's services, as specified above, are various services in Classes 35, 39, and 43, relating to temporary accommodations and travel.[15]

According to Opposer, Applicant's services are "subsumed by the broad scope of" Opposer's registrations and thus "are identical in part–or at a minimum highly related" to Opposer's services.[16] To make this argument, Opposer recharacterizes Applicant's services as "providing temporary accommodations related to health and wellness,"[17] based, in part, on Applicant's statements that its services have a

---

[15] The classification of the respective services is not a factor in our likelihood-of-confusion analysis. "The classification of goods and services by the USPTO is a purely administrative determination that has no bearing on the issue of likelihood of confusion." *In re Rum & Spirits Corp.*, No. 86873768, 2018 TTAB LEXIS 4, at *11 n.8 (citing Trademark Act Section 30, 15 U.S.C. § 1112 ("The Director may establish a classification of goods and services, for convenience of Patent and Trademark Office administration, but not to limit or extend the applicant's or registrant's rights.") and *Jean Patou Inc. v. Theon Inc.*, 9 F.3d 971, 975 (Fed. Cir. 1993) ("[C]lassification is wholly irrelevant to the issue of registrability under section 1052(d), which makes no reference to classification.")).

[16] Opposer's Brief, 25 TTABVUE 34-35.

[17] *Id.* at 35.

12

Opposition No. 91288785

"temporary accommodation aspect" and Applicant's "mission [is] to provide both comfortable accommodations and opportunities for personal growth and healing."[18]

Applicant, on the other hand, asserts that its services "are distinctly different from those of [Opposer],"[19] because Applicant "specializes in wellness and therapy retreats with a clear focus on mental health, relationships, and trauma therapy, which are markedly different from [Opposer's] general travel and accommodation offerings."[20]

We disagree with Opposer's recharacterization of Applicant's services as primarily "providing temporary accommodations" and with Opposer's related argument that the respective services are identical in part, or "highly related," simply because Applicant's health spa services may be provided in a temporary on-site location. While Applicant's own statements may refer to a "temporary accommodation aspect" of its services, including "[t]emporary accommodation arrangements in connection with wellness retreats,"[21] we reiterate that our analysis must be based on Applicant's services as they are identified in the application. *Stone Lion*, 746 F.3d at 1323; *Coach Servs. v. Triumph Learning LLC*, 668 F.3d 1356, 1369 (Fed. Cir. 2012). And under a plain reading of the identification here, Applicant's services consist of "health spa services for health and wellness of the mind, body, and spirit," with the wording

---

[18] Opposer's Fourth Notice of Reliance, 22 TTABVUE 18-19 (Applicant's Response to Opposer's First Set of Interrogatories).

[19] Applicant's Answer, 4 TTABVUE 4.

[20] *Id.* at 4-5.

[21] Opposer's Fourth Notice of Reliance, 22 TTABVUE 21 (Applicant's Response to Opposer's First Set of Interrogatories).

13

Opposition No. 91288785

"offered in or from a remote, mobile or temporary on-site location" merely specifying an ancillary aspect of the services, namely, how or where the services are to be rendered. In other words, the identification indicates that Applicant offers health spa services, which may be provided in a temporary location, or from a mobile location, or even remotely. The identification does not indicate that Applicant is arranging temporary lodging or accommodations, enabling reservations for that purpose, or even providing information in that field. Thus, we concur with Applicant that the respective services are different.

However, our inquiry into relatedness does not end there, as even different services may be found related for purposes of the likelihood-of-confusion analysis. *See Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1267 (Fed. Cir. 2002) ("Even if the goods and services in question are not identical, the consuming public may perceive them as related enough to cause confusion about the source or origin of the goods and services."). Indeed, it is sufficient that the services are related in some manner, or that the conditions and activities surrounding their marketing are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originate from the same source. *See Coach Servs.*, 668 F.3d at 1396 (Fed. Cir. 2012); *7-Eleven, Inc. v. Wechsler*, No. 91117739, 2007 TTAB LEXIS 58, at *28-29. Thus, the issue is not whether consumers would confuse Applicant's services with Opposer's services, but rather whether there is a likelihood of confusion as to the

14

Opposition No. 91288785

source of these goods. *See L'Oreal S.A. v. Marcon*, No. 91184456, 2012 TTAB LEXIS 77, at *16; *In re Rexel Inc.*, No. 73241423, 1984 TTAB LEXIS 57, at *2.

On that point, we consider Opposer's argument that the respective services are related because "through [Opposer's] online marketplace, consumers can . . . search for and find wellness-related accommodations, services, and experiences, including, by way of example only, sunrise yoga experiences, cold plunge experiences, naturalist hikes and native plant tea explorations, and spa or spa-like experiences."[22]

Opposer's evidence[23] includes the following excerpt from its website:[24]



---

[22] Opposer's Brief, 25 TTABVUE 34.

[23] *See* Opposer's Third Notice of Reliance, 21 TTABVUE 10-113.

[24] *Id.* at 81 (red arrows added).

Opposition No. 91288785

This excerpt shows that users of Opposer's online marketplace for temporary accommodations may also search the marketplace for "Wellness activities in California." Although the excerpt indicates that the "wellness activities" are "led by local experts," they are explicitly branded as "AIRBNB EXPERIENCES." Other evidence shows listings for various "wellness-related" experiences that consumers may book through Opposer's AIRBNB-branded online marketplace, which are offered and provided by apparent third parties identified as "Hosts."[25] But, regardless of whether the advertised "wellness activity" services are ultimately provided by Opposer or by third-party affiliates of Opposer, this evidence supports the conclusion that consumers may view Opposer's and Applicant's respective services as related because such services may be offered by the same source under the same mark. *See Coach Servs.*, 668 F.3d at 1396.

In addition, this evidence establishes that experiences, including wellness activities, can be an integral part of travel and thus are relevant to the travel planning and booking process. Thus, consumers may utilize both Opposer's and Applicant's services in a complementary fashion. *Cf., e.g.*, *Venture Out Props. LLC. V. Wynn Resorts Holdings, LLC*, No. 91167237, 2007 TTAB LEXIS 1, at *20-21 (finding hotel services and restaurant/bar services are "highly similar . . . in that hotel guests often dine in restaurants and drink in bars and lounges during their travels, as well as engage in recreational activities, such as gambling in casinos"); *In re*

---

[25] *See, e.g.*, *id.* at 59-62, 67-79. The online marketplace also allows users to apply a filter to their searches to find specific activity types, including "wellness." *Id.* at 21.

16

Opposition No. 91288785

*Summit Hotel Corp.*, No. 73233333, 1983 TTAB LEXIS 68, at *4 ("Restaurants and hotels offer complementary services to the same general class of consumers."). Accordingly, we find that consumers may perceive the respective services as related based on their nature and how they are offered to, and used by, consumers in the marketplace. Therefore, the second *DuPont* factor weighs in favor of a conclusion that confusion is likely.

### C. Similarity of Trade Channels and Classes of Consumers

Next, we consider established, likely-to-continue channels of trade, the third *DuPont* factor. *DuPont*, 476 F.2d at 1361. Opposer argues that "neither the Application nor the [Opposer's] Registrations contain a restriction to particular channels of trade and or a particular type of consumer."[26] And Applicant, for its part, admits that its "application contains no restrictions on trade channels."[27] Thus, other than taking into account the wording in Application's identification indicating the types of locations at which the services may be provided, we presume that the respective identifications encompass all services of the type described, that the identified services travel through all normal channels of trade for such services, and that they are available to all classes of purchasers of such services. *See Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 719 F.3d 1367, 1373 (Fed. Cir. 2013); *In re Guild Mortg. Co.*, No. 86709944, 2020 TTAB LEXIS 17, at *15.

---

[26] Opposer's Brief, 25 TTABVUE 36.

[27] Applicant's Answer, 4 TTABVUE 2-4.

Opposition No. 91288785

And, here, Opposer's evidence of record, particularly the listings for third-party services on Opposer's online marketplace, supports a finding that the respective services are encountered by the same classes of consumers in the same channels of trade. Specifically, the evidence indicates that consumers seeking accommodations and travel information may also seek to book experiences, including "wellness activities" and "spa or spa-like" services, to complement their trip.[28] In other words, those making travel arrangements, including reservations for temporary accommodations, may also seek health spa services for wellness, and they may do so through the same channels of trade, including an online marketplace. We therefore reject Applicant's assertion that, because none of Opposer's registrations cover Applicant's identified Class 44 services, the respective "services will [not] be marketed to overlapping classes of consumers or through overlapping channels of trade."[29]

The third *DuPont* factor thus also weighs in favor of a conclusion that confusion is likely.

### D.  Strength of Opposer's AIRBNB Mark

Before we compare the marks, we consider the strength or weakness of Opposer's AIRBNB mark as used in connection with the relevant services because it affects the mark's scope of protection. *See Made in Nature*, 2022 TTAB LEXIS 228, at *23-24 (quoting *DuPont*, 476 F.2d at 1361); *In re Morinaga Nyugyo K.K.*, No. 86338392, 2016

---

[28] Opposer's Third Notice of Reliance, 21 TTABVUE 10-113.

[29] Applicant's Answer, 4 TTABVUE 4.

18

Opposition No. 91288785

TTAB LEXIS 448, at *17-18 ("[T]he strength of the cited mark is—as always—relevant to assessing the likelihood of confusion under the *du Pont* framework."). "A well-known mark enjoys an appropriately wider latitude of legal protection, for similar marks tend to be more readily confused with a mark that is already known to the public." *Opryland USA Inc. v. Great Am. Music Show, Inc.*, 970 F.2d 847, 851 (Fed. Cir. 1992) (citation omitted).

When evaluating the strength or weakness of a mark, we look at the mark's inherent conceptual strength based on the nature of the term itself and its commercial strength in the marketplace. *See Spireon, Inc. v. Flex Ltd.*, 71 F.4th 1355, 1362 (Fed. Cir. 2023) ("Two of the *DuPont* factors (the fifth and sixth) consider strength. The fifth *DuPont* factor, '[t]he fame of the prior mark (sales, advertising, length of use),' is a measure of the mark's strength in the marketplace. . . . There are two prongs of analysis for a mark's strength under the sixth factor: conceptual strength and commercial strength." (internal citations omitted)); *In re Chippendales USA, Inc.*, 622 F.3d 1346, 1353-54 (Fed. Cir. 2010) (measuring both conceptual and marketplace strength); *Made in Nature*, 2022 TTAB LEXIS 228, at *24.

The sixth *DuPont* factor allows an applicant to argue that confusion is less likely by adducing evidence of conceptual and commercial weakness. *Spireon*, 71 F.4th at 1362. By contrast, the fifth *DuPont* factor enables an opposer to prove that its pleaded mark is entitled to an expanded scope of protection by adducing evidence of the fame of the prior mark (e.g., sales, advertising, length of use). *Id.*

19

Opposition No. 91288785

###### 1.   Sixth *DuPont* Factor

We first consider the conceptual strength of Opposer's AIRBNB mark under the sixth *DuPont* factor. Conceptual strength, or inherent strength, is a measure of a mark's distinctiveness and may be placed "in categories of generally increasing distinctiveness: . . . (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Marks in the latter three categories are considered inherently distinctive. *See Chippendales*, 622 F.3d at 1351.

Because Opposer's AIRBNB mark issued on the Principal Register without a claim of acquired distinctiveness, the mark is presumed to be inherently distinctive as to the services listed in the pleaded registrations. 15 U.S.C. § 1057(b); *Tea Bd. of India v. Republic of Tea, Inc.*, No. 9118587, 2006 TTAB LEXIS 330, at *62 ("A mark that is registered on the Principal Register is entitled to all Section 7(b) presumptions including the presumption that the mark is distinctive and moreover, in the absence of a Section 2(f) claim in the registration, that the mark is inherently distinctive for the goods.").

Further, Applicant admits that "the term 'AIRBNB' has no ordinary English language meaning,"[30] and we find no evidence of record to the contrary. As to the term's origin, Opposer explains that it "adopted the name and mark AIRBNB to replace the original name 'Airbed & Breakfast,' which had referred to the fact that the company's founders had previously rented out a room with three airbeds in their

---

[30] *Id.* at 3.

20

Opposition No. 91288785

apartment to make extra money, adding free breakfast as a perk."[31] Accordingly, we find that, as applied to the services in the pleaded registrations, AIRBNB, as a whole, is at least arbitrary and thus conceptually strong. *See Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1372 (Fed. Cir. 2005) (indicating that an arbitrary term is "conceptually strong as a trademark"); *Nautilus Grp., Inc. v. Icon Health & Fitness, Inc.*, 372 F.3d 1330, 1340 (Fed. Cir. 2004) ("[A]n arbitrary mark is a known word used in an unexpected or uncommon way.").

However, the U.S. Court of Appeals for the Federal Circuit has held that if there is evidence that a mark, or an element of a mark, is commonly adopted by many different registrants, that may indicate that the mark or common element has some conceptual weakness as an indicator of a single source. *See Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1374 (Fed. Cir. 2015) ("[E]vidence of third-party registrations is relevant to 'show the sense in which a mark is used in ordinary parlance,' . . . that is, some segment that is common to both parties' marks may have 'a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that segment is relatively weak.'") (quoting *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 1339 (Fed. Cir. 2015)).

In this case, Applicant has asserted that the "BNB" portion of Opposer's AIRBNB mark "is a generic term in the hospitality industry and does not exclusively relate to

---

[31] Testimony Declaration of Rebecca Williams, 14 TTABVUE 2.

Opposition No. 91288785

[Opposer]," an issue we address later in this opinion.[32] But Applicant has not submitted any evidence to establish that AIRBNB, as a whole, should be considered conceptually weak. As to the commercial strength of Opposer's mark, there is likewise no evidence of record to establish that the consuming public is exposed to widespread third-party use of marks similar to AIRBNB in connection with similar services, such that Opposer's mark may be considered "relatively weak and entitled to only a narrow scope of protection." *Palm Bay*, 396 F.3d at 1373.

The sixth *DuPont* factor is therefore neutral.

### 2.  Fifth *DuPont* Factor

Opposer argues that its AIRBNB mark "famous for the purposes of assessing likelihood of confusion,"[33] invoking the fifth *DuPont* factor concerning "[t]he fame of the prior mark." *DuPont*, 476 F.3d at 1361. The fame or commercial strength of a mark is relevant to the likelihood-of-confusion analysis because, "[a] mark with extensive public recognition and renown deserves and receives more legal protection than an obscure or weak mark." *Omaha Steaks Int'l, Inc. v Greater Omaha Packing Co.*, 908 F.3d 1315, 1319 (Fed. Cir. 2018) (quoting *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992)). In this context, the commercial strength of a mark is not a binary factor, but instead "varies along a spectrum from very strong to very weak." *Joseph Phelps Vineyards Holdings, LLC v. Fairmont*

---

[32] Applicant's Answer, 4 TTABVUE 3.

[33] Opposer's Brief, 25 TTABVUE 11.

Opposition No. 91288785

*Holdings, LLC*, 857 F.3d 1323, 1325 (Fed. Cir. 2017) (quoting *Palm Bay*, 396 F.3d at 1374-75).

Such strength rests on the extent to which "a significant portion of the relevant consuming public . . . recognizes the mark as a source indicator." *Joseph Phelps Vineyards*, 857 F.3d at 1324-25 (citing *Palm Bay* 396 F.3d at 1374-75). Here, the relevant consuming public consists of actual and prospective purchasers of the services identified in Opposer's relevant pleaded registrations, including the services of "arranging temporary housing accommodations," "providing online reservation services for temporary lodging," and "travel agency services, namely, making reservations and bookings for transportation, excursions, travel tours and travel." *See Palm Bay*, 396 F.3d at 1374-75 ("[T]he proper legal standard for evaluating the fame of a mark under the fifth DuPont factor is the class of customers and potential customers of a product or service, and not the general public."); *see also Tripleye*, 2024 TTAB LEXIS 494, at *51.

In assessing commercial strength or fame, we may consider not only direct evidence, such as consumer surveys or declarations, but also indirect evidence, including the volume of sales and advertising expenditures in connection with the identified services sold under the mark; the length of time the mark has been in use; widespread critical assessments; notice by independent sources of the services offered under the marks; and the general reputation of the services. *Weider Publ'ns, LLC v. D & D Beauty Care Co.*, No. 91199352, 2014 TTAB LEXIS 2, at *18-19; *see also Bose*

23

Opposition No. 91288785

*Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 1371 (Fed. Cir. 2002) (recognizing

indirect evidence as appropriate proof of strength).

Opposer, as the party asserting that its mark is famous, must clearly prove it.

*Coach Servs.*, 668 F.3d at 1367 (citing *Leading Jewelers Guild Inc. v. LJOW Holdings*

*LLC*, No. 91160856, 2007 TTAB LEXIS 35, at *12). To that end, Opposer relies, in

part, on a March 2021 report regarding an online survey "designed, supervised, and

implemented by Hal L. Poret,"[34] which was intended "to measure 'the extent to which

the AIRBNB mark is famous, if at all, in connection with rental property reservation

services.'"[35]

The survey involved 300 respondents from "among a representative sample of the

general consuming public of the U.S.,"[36] who "were first asked to list all companies,

websites, or mobile apps that they are aware of that offer the relevant type of services

. . . without the survey showing or mentioning the [AIRBNB] mark."[37] This measured

the respondents' "unaided awareness" of Opposer's mark.[38] Next, the "[r]espondents

were . . . shown a total of seven names [including the AIRBNB mark], one at a time,

---

[34] Testimony Declaration of Hal Poret, 16 TTABVUE 8 (Poret Survey Report).

[35] Opposer's Brief, 25 TTABVUE 37.

[36] Testimony Declaration of Hal Poret, 16 TTABVUE 9. While the relevant public here consists of actual and prospective purchasers of the services identified in Opposer's relevant pleaded registrations, including accommodation and travel services, we presume that the members of the general consuming public who participated in the survey would be actual and potential purchasers of such services.

[37] *Id.*

[38] *Id.*

Opposition No. 91288785

and . . . asked whether . . . they have ever seen or heard of the name."[39] This measured the respondents "aided awareness" of Opposer's mark.[40]

According to Mr. Poret's report, the survey showed that 32.7% of respondents had an unaided awareness of AIRBNB in connection with the relevant services,[41] while 90.3% had an aided awareness of the mark.[42] The "next most frequently identified brands" were ZILLOW, which had an unaided awareness rate of 12%,[43] and VRBO, which had an unaided awareness rate of 11% and an aided awareness rate of 40%.[44] In comparison, the fictitious control mark, TROUBA,[45] had an aided awareness rate of 4.3%.[46] Based on these results, the report concludes with Mr. Poret's opinion that "that the AIRBNB word mark is famous."[47] Applicant has not submitted any arguments or evidence to rebut the survey or the findings in Mr. Poret's report.

We agree that the survey indicates a relatively high brand awareness of Opposer's AIRBNB mark. But a couple issues weaken its probative value. First, the survey was conducted in March 2021, and thus is now nearly five years old. Therefore, it may not

---

[39] *Id.*

[40] *Id.*

[41] *See id.* at 24.

[42] *See id.* at 26.

[43] *Id.* at 25-26. The ZILLOW mark was not included in the aided awareness portion of the survey (*see id.* at 26) and thus there was no aided awareness rate.

[44] *Id.* at 24-26.

[45] *See id.* at 13 ("The purpose of including the control name [in the survey's aided awareness portion] was to measure survey noise – i.e., the extent to which respondents indicate false awareness of a term that is not actually used in connection with the relevant category, such as due to respondent error, assumption, guessing, or yea-saying.").

[46] *Id.* at 26.

[47] *Id.* at 31.

25

Opposition No. 91288785

accurately reflect contemporary consumer awareness of the AIRBNB mark. *Cf. Royal Crown Co. v. Coca-Cola Co.*, 892 F.3d 1358, 1371 (Fed. Cir. 2018) ("[A]s it cannot disclose contemporary public perception, the probativeness of this survey [conducted more than five years before the close of testimony], even merely to support other evidence, is questionable."); *In re Morton-Norwich Prods.*, 671 F.2d 1332, 1344 (Fed. Cir. 1982) ("[T]he factual situation may be different in 1982 than it was in May 1978 when appellant had the survey conducted."); *In re Audemars Piguet Holding SA*, No. 90045780, 2025 TTAB LEXIS 1, at *54-55 (2025) (noting that the "results of a survey conducted over a decade ago are a highly suspect basis on which to determine consumer perception now").

Second, "in general, the Board has discouraged heavy reliance on aided awareness to prove fame." *ProMark Brands Inc. v. GFA Brands, Inc.*, No. 91194974, 2015 TTAB LEXIS 67, at *48 (finding that survey showing 82% aided awareness of opposers' mark "lack[ed] significant evidentiary value on the question of fame.") (citing *Carefirst of Md., Inc. v. FirstHealth of the Carolinas, Inc.*, No. 91116355, 2005 TTAB LEXIS 406, at *49). While aided awareness relies on the prompting of survey participants with a list of marks, including the mark being assessed, unaided awareness does not. Thus, unaided awareness is entitled to more weight than aided awareness on the question of fame. *See Carefirst*, 2005 TTAB LEXIS 406, at *49. And, here, unaided awareness is significantly lower than aided awareness.

Aside from the survey report, the record contains a declaration from Opposer's Director of Business Affairs, Ms. Rebecca Williams, who states that the "AIRBNB

26

Opposition No. 91288785

brand [is] known worldwide as identifying a community marketplace in which people can list, view, and book unique accommodations and experiences around the world through its people-powered hospitality service offered on its website at www.Airbnb.com and through its mobile app."[48] And Opposer has provided copies of its SEC Form 10-K filings,[49] which, inter alia, indicate that Opposer has spent billions of dollars on "sales and marketing" and "product development" from 2020 to 2023, and that its revenue ranged from over $3 billion to over $8 billion in those same years.[50] These figures are impressive on their face and suggest that Opposer has enjoyed immense commercial success. But Opposer has pointed to no other evidence, aside from the survey, showing its efforts to create or increase consumer awareness of the AIRBNB mark in connection with the relevant services, or otherwise demonstrating that Opposer's mark enjoys wide recognition among the relevant consumers, such as evidence of advertisements over the duration of the mark's use, promotional activities in various forms of media in connection with the mark, or unsolicited media coverage of the services offered under the mark. *See, e.g.*, *Weider Publ'ns*, 2014 TTAB LEXIS 2, at *18-19; *cf. Palm Bay*, 396 F.3d at 1375-76 (finding VEUVE CLICQUOT famous among purchasers of champagne and sparkling wine based upon sale in 8,000 restaurants nationwide, and in liquor stores, wine shops and other retail establishments; extensive promotional campaign consisting of print

---

[48] Testimony Declaration of Rebecca Williams, 14 TTABVUE 2.

[49] *See id.* at 18-411.

[50] *Id.* at 128, 345.

27

Opposition No. 91288785

advertisements in general interest magazines and in wine specialty magazines, radio ads, point-of-sale displays, wine tastings; and unsolicited media coverage in publications including the *New York Times, Boston Globe,* and *Money Magazine*).

Opposer also points to its efforts to protect its AIRBNB mark through the filing of opposition and cancellation proceedings against marks including SEABNB, MAILBNB, BAGBNB, VR-BNB, SHARPBNB, THE ARTBNB, TREEBNB, GRADBNB, CAREBNB, CARBNB, FURBNB, PETBNB, PINESBNB, and TALLYBNB.[51] But the majority of these oppositions and cancellations were sustained by default judgment or otherwise upon the abandonment of the involved applications or surrender of the respondent's registration. *Cf. In re Wella Corp.*, 565 F.2d 143, 144 n.2 (CCPA 1977) ("Appellant argues that various letters (of record) from competitors indicating their discontinuance of use of its mark upon threat of legal action are evidence of its distinctiveness, but we agree with the TTAB that such evidence shows a desire of competitors to avoid litigation rather than distinctiveness of the mark."). While this evidence establishes that Opposer has been active and successful in its enforcement efforts in connection with the AIRBNB mark, it is not particularly probative of whether AIRBNB is famous. *See Omaha Steaks*, 908 F.3d at 1323 ("[T]he mere fact that lawsuits were filed is not reasonably probative of the fame inquiry, which is focused on whether the mark has achieved 'extensive public recognition and renown,' not on enforcement efforts.") (internal citation omitted); *Monster Energy*, 2023 TTAB LEXIS 14, at *64 n. 83 ("[W]e are not concerned with mere efforts at

---

[51] Opposer's Brief, 25 TTABVUE 40.

28

Opposition No. 91288785

enforcement, but rather with the context surrounding successful enforcement and how that evidence bears on consumer recognition of any place applicant may have in the market.").

Accordingly, we find that, based on the record before us, Opposer has not proved that its AIRBNB mark falls on the strongest end of the strength spectrum for likelihood of confusion purposes. *See Coach Servs.*, 668 F.3d at 1367. That said, it does place at the higher end of the commercial strength spectrum, and is thus entitled to a broader scope of protection against confusingly similar marks. *See Joseph Phelps Vineyards*, 857 F.3d at 1325 The fifth *DuPont* factor therefore weighs in favor of a conclusion that confusion is likely.

### E.  Comparison of the Marks

We turn now to the first *DuPont* factor, which focuses on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *See Palm Bay,* 396 F.3d at 1371 (quoting *DuPont*, 476 F.2d at 1361). Similarity as to any one of these elements may be sufficient to support a finding that the marks are confusingly similar. *See Krim-Ko Corp. v. Coca-Cola Co.*, 390 F.2d 728, 732 (CCPA 1968) ("It is sufficient if the similarity in either form, spelling or sound alone is likely to cause confusion."); *In re Inn at St. John's, LLC*, No. 87075988, 2018 TTAB LEXIS 170, at \*13. *But see Champagne Louis Roederer S.A. v. Delicato Vineyards*, 148 F.3d 1373, 1375 (Fed. Cir. 1998) ("[O]ne DuPont factor may be dispositive in a likelihood of confusion analysis, especially when that single factor is the dissimilarity of the marks.").

29

Opposition No. 91288785

In assessing the similarity of the marks, all elements of the marks must be considered. *In re Nat'l Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985). "The proper test is not a side-by-side comparison of the marks, but instead whether the marks are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between the parties." *In re i.am.symbolic*, 866 F.3d 1315, 1324 (Fed. Cir. 2017) (quoting *Coach Servs.*, 668 F.3d at 1368 (internal quotation marks omitted)). And "[t]he focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks." *In re Box Sols. Corp.*, No. 76267086, 2006 TTAB LEXIS 176, at *14.

Here, Applicant's mark is SOUL BNB in standard characters and Opposer's mark is AIRBNB, also in standard characters. Thus, both marks consist of a term (SOUL or AIR) combined with, or followed by, the term BNB.

Opposer argues that "[f]or purposes of comparison to [its] AIRBNB Marks, the dominant and therefore most salient element of Applicant's mark is the distinctive term 'BNB,'" because "the SOUL element is weak and descriptive"[52] in that it describes Applicant's "'primary focus . . . on offering wellness and therapy retreats.'"[53] According to Opposer, the shared BNB element renders the respective marks "highly

---

[52] *Id.* at 31.

[53] *Id.* at 29-30 (quoting Applicant's Answer, 4 TTABVUE 3).

Opposition No. 91288785

similar" and "reinforces the confusing and misleading message that Applicant's Mark is an extension of [Opposer's] AIRBNB Marks."[54]

For its part, Applicant asserts that the "term 'BNB' (bed and breakfast) is a generic term in the hospitality industry and does not exclusively relate to Opposer," and that SOUL BNB "significantly differs from [Opposer's AIRBNB] Mark in aspects such as prefix, spacing of characters, sound, connotation, intended market, and overall meaning."[55]

We acknowledge that the appearance of BNB in both marks does create a point of visual and aural similarity between the marks. But we must consider and compare both marks as a whole; we may not dissect the marks by ignoring their other elements. *See Nat'l Data Corp.*, 753 F.2d at 1058 (indicating that, when comparing marks, "the ultimate conclusion rests on consideration of the marks in their entireties"). And, despite the shared BNB element, we are not convinced that the marks create similar overall commercial impressions or are otherwise similar in terms of sound, appearance, or connotation.

Regarding dominant elements in the marks, we disagree with Opposer that BNB is the dominant element in Applicant's mark or, for that matter, Opposer's mark. While "[t]here is no mechanical test to select the dominant element of a mark," *Monster Energy*, 2023 TTAB LEXIS 14, at *45, we find that AIR is the dominant element of Opposer's mark, while SOUL is the dominant one in Applicant's mark.

---

[54] Opposer's Brief, 25 TTABVUE 33.

[55] *See* Applicant's Answer, 4 TTABVUE 3. We are unsure what Applicant means by "intended market" in the context of the mark comparison.

Opposition No. 91288785

These terms appear first in the respective marks and are therefore likely to create the strongest impression. *See In re Detroit Athletic Co.*, 903 F.3d 1297, 1303 (Fed. Cir. 2018) (noting that consumers "typically notice [initial] words first"); *see also Palm Bay*, 396 F.3d at 1372 ("VEUVE . . . remains a 'prominent feature' as the first word in the mark and the first word to appear on the label."); *Monster Energy*, 2023 TTAB LEXIS 14, at \*29 ("[T]he first term generally is the one which creates the strongest impression.").

Further, we find that AIR and SOUL are the dominant elements in the respective marks because they are each more distinctive than BNB. The term "air" may be defined variously as "a light breeze," "the mixture of invisible orderless tasteless gases . . . that surrounds the earth," "aviation," "empty space," or "nothingness."[56] And we have Opposer's testimony that AIRBNB was selected because it "referred to the fact that the company's founders had previously rented out a room with three airbeds in their apartment to make extra money, adding free breakfast as a perk."[57] Thus, as used in connection with Opposer's services, AIR appears to be arbitrary. *See Nautilus*, 372 F.3d at 1340 ("[A]n arbitrary mark is a known word used in an unexpected or uncommon way."). As to "soul," the term may be defined as, inter alia, "the immaterial essence, animating principle, or actuating cause of an individual

---

[56]    MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/air (accessed on January 27, 2026). The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed form or regular fixed editions. *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imps. Co.*, No. 91061847, 1982 TTAB LEXIS 146, at \*7, *aff'd*, 703 F.2d 1372 (Fed. Cir. 1983); *In re Red Bull GmbH*, No. 75788830, 2006 TTAB LEXIS 136, at \*7; TBMP § 1208.04.

[57] Testimony Declaration of Rebecca Williams, 14 TTABVUE 2.

Opposition No. 91288785

life," "a person's total self," "spiritual or emotional nature of human beings," or "spiritual or moral force."[58] Thus, despite Opposer's arguments to the contrary, we find that SOUL is at least suggestive in connection with Applicant's services, as, in Applicant's words, it may "indicate[] a commitment to wellness, healing, and tranquility."[59]

Regarding the term BNB, Opposer introduced an expert report by Dr. Philip M. Carter, a professor of linguistics, expressing his opinion that "the sequence bnb does not have longstanding use in American English," "in contrast to the terms [']bed and breakfast['] and [']B&B[']."[60] According to Dr. Carter's report, the sequence bnb is a new term in American English," which began to appear "with systematic regular usage . . . after 2009."[61] Dr. Carter asserts that the data he collected "strongly suggest that ordinary speakers of American English disambiguate the generic forms 'B&B' and 'B and B,' used as abbreviations for 'bed and breakfast,' from the new form [']bnb['], which is closely associated with a brand."[62] Specifically, the report indicates that "search term data shows that the sequence bnb is by and large associated with the brand Airbnb."[63] It also indicates that, while BNB does not appear in modern

---

[58]    MERRIAM-WEBSTER    DICTIONARY,    https://www.merriam-webster.com/dictionary/soul (accessed on January 27, 2026).

[59] Applicant's Answer, 4 TTABVUE 3.

[60] Testimony Declaration of Philip M. Carter, 18 TTABVUE 7-8.

[61] *Id.* at 8 (italics removed).

[62] *Id.* at 9 (italics removed).

[63] *Id.* at 45 (italics removed).

33

Opposition No. 91288785

dictionaries,[64] the terms "B and B," "B & B" and "b. & b.," the abbreviated forms of "bed and breakfast," do.[65]

We find Dr. Carter's report largely unpersuasive as to the distinctiveness of the term BNB in Opposer's mark. The fact that "BNB" may not have longstanding use in American English does not preclude a finding that consumers are currently familiar with the term. Nor does the existence and use of other terms to refer to "bed and breakfast" services, such as "B and B" or "B&B," necessarily render BNB distinctive. *See, e.g.*, *In re Murphy Door Bed Co.*, No. 73271208, 1984 TTAB LEXIS 56, at *10-12 (rejecting applicant's argument that MURPHY was a trademark and finding that the term was instead generic for a type of bed despite evidence that there was a "number of other terms" to identify such a bed); *see also KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004) (acknowledging "the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first"); *cf. In re Fat Boys Water Sports LLC*, No. 86490930, 2016 TTAB LEXIS 150, at *10 ("Under the current standard [for assessing mere descriptiveness], there is no requirement that the Examining Attorney prove that others have used the mark at issue or that they need to use it, although such proof would be highly relevant to an analysis under Section 2(e)(1)."). And, while the report concludes that consumers associate BNB with Opposer's mark AIRBNB, that conclusion is based on a review of online search term data, rather than

---

[64] *Id.* at 11.

[65] *Id.* at 12.

Opposition No. 91288785

a true trademark inquiry into the perception of the relevant public who encounters the term BNB in connection with Opposer's services. *See Anheuser-Busch, Inc. v. Holt*, No. 91180119, 2009 TTAB LEXIS 599, at *24 ("[T]here is simply nothing that persuades us that the lone opinion of opposer's asserted linguistics expert should substitute for evidence of the perception of the consuming public of the involved marks.").

Based on the record, including the dictionary evidence in Dr. Carter's report, we find that that BNB may be pronounced as the phonetic equivalent of "B & B," and would thus evoke an immediate association with the term "bed and breakfast." *See In re Calphalon Corp.*, No. 86356713, 2017 TTAB LEXIS 98, at *29 ("We find that SHARPIN evokes an immediate association with the phonetically-identical and otherwise virtually-identical word 'sharpen,' and there is nothing incongruous about the use of the word sharpen [or its phonetic equivalent SHARPIN] to describe the function of goods . . . [with] 'built-in sharpeners that automatically sharpen knives.'"); *In re White Swan Ltd.*, No. 73617169, 1988 TTAB LEXIS 37, at *3 ("The fact that the registrant's mark contains the letter 'N' surrounded by hyphens and applicant's mark contains an ampersand constitutes but a very minor difference. The letter 'N' and the ampersand are pronounced either in identical fashion or in near identical fashion."). Thus, when used in connection with bed-and-breakfast services, BNB is likely to be perceived as highly suggestive, if not descriptive.

Opposition No. 91288785

Opposer disputes this, asserting that "[n]one of the Airbnb registrations recite bed and breakfast services,"[66] which is true insofar as these services are not specifically named in the registrations. However, at least one of the pleaded registrations identifies services in the nature of "arranging temporary housing accommodations," "providing online reservation services for temporary lodging," "travel agency services, namely, . . . lodging," and "providing temporary lodging information via the Internet."[67] The wording "lodging," "temporary lodging," and "temporary housing accommodations," is broad enough to include bed-and-breakfast services, which according to Opposer's evidence, involve "an accommodation offered by an inn, hotel, or [especially] a private home, consisting of a room for the night and breakfast the next morning for one inclusive price."[68] Therefore, Opposer's services do encompass bed-and-breakfast accommodations, despite not being explicitly referenced in Opposer's registrations.

Regarding the significance of BNB in SOUL BNB, Applicant explains that it "stands for 'Bed And Breakthrough,' the motto of the business as noted on the [Applicant's] public website."[69] However, we have no evidence showing that consumers would perceive the mark in this manner. And, as discussed above, Applicant's identified services do not primarily involve the provision of temporary

---

[66] Opposer's Brief, 25 TTABVUE 23.

[67] *See* Registration No. 3890027.

[68] Testimony Declaration of Philip M. Carter, 18 TTABVUE 17 (quoting an excerpt from THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE).

[69] Applicant's Answer, 4 TTABVUE 3.

Opposition No. 91288785

accommodations or lodging, but are instead "health spa services for health and wellness of the mind, body and spirit offered in or from a remote, mobile or temporary on-site location." That said, because the "temporary on-site location[s]" of Applicant's services could include temporary locations in the nature of bed-and-breakfast establishments, consumers may view BNB as suggestive of that ancillary aspect of Applicant's services.

Having assessed the significance and distinctiveness of the individual elements of the respective marks, we must now consider the marks overall. We find the marks AIRBNB and SOUL BNB have first and dominant terms which differ significantly in appearance, sound, and connotation. That is, AIRBNB might bring to mind light and easy accommodations for travel, or allude to Opposer's origins, while SOUL BNB might connote services intended for a person's spiritual or emotional health, which may take place in comfortable, but temporary, locations.

Accordingly, while we must presume that the relevant consumers will retain a general rather than specific recollection of trademarks, *see Box Sols.*, 2006 TTAB LEXIS 176, at *14, we conclude that the relevant consumers are likely to differentiate between the two marks, regardless of the single point of similarity provided by the shared term BNB, because the marks otherwise feature completely different dominant terms, AIR and SOUL, resulting in significant overall differences in sound, appearance, and commercial impression.

The first *DuPont* factor thus weighs heavily against a conclusion that confusion is likely.

37

Opposition No. 91288785

### F. Actual Confusion

The seventh *DuPont* factor relates to the nature and extent of any actual confusion. *See DuPont*, 476 F.2d at 1361. Opposer correctly notes that a showing of actual confusion is not necessary to find that there is a likelihood of confusion.[70] *See Detroit Athletic*, 903 F.3d at 1309. Nonetheless, in the absence of any evidence showing actual instances confusion in the marketplace, Opposer has submitted a survey[71] "design[ed] and conduct[ed] . . . to assess whether the SOUL BNB mark is likely to cause confusion with respect to Airbnb and its AIRBNB marks."[72] While the survey is not direct evidence of actual confusion, we may consider it as circumstantial evidence from which we may infer whether there is a likelihood of confusion. *ProMark Brands*, 2015 TTAB LEXIS 67, at *49.

Opposer provided the following description of the submitted survey, which was conducted by Dr. David Neal, the managing partner of "a research consulting firm specializing in the analysis of human decision making and consumer behavior":[73]

> Dr. Neal began by selecting a universe of respondents ultimately consisting of "405 U.S. adults that have made a reservation, booking, or purchase of health spa services for health or wellness in the past year, or are likely to make a reservation, booking, or purchase of health spa services for health or wellness in the next year." He divided respondents into two groups: a Test Group, which was shown Applicant's SOUL BNB Mark (as shown in Applicant's application); and a Control Group, which was shown the mark SOUL STAY, which served as a "close unaccused alternative for the Test Cell." Dr. Neal chose SOUL STAY because it "has the same first word, 'SOUL,'" "has not been accused of infringing"

---

[70] Opposer's Brief, 25 TTABVUE 40.

[71] Testimony Declaration of David Neal, 17 TTABVUE.

[72] Opposer's Brief, 25 TTABVUE 40-41.

[73] Testimony Declaration of David Neal, 17 TTABVUE 2.

38

Opposition No. 91288785

the AIRBNB Marks, and "eliminates the BNB lettering common to the Applicant's SOUL BNB Mark and the Opposer's AIRBNB Marks." "Accordingly, it provides a fair, valid, and reliable measure of any baseline confusion in the marketplace stemming from factors other than trademark confusion (e.g., guessing, general beliefs that the relevant services may all be put out by the same company or brand, etc.)."

Dr. Neal's survey revealed that 18.0% of the Test Group respondents expressed confusion with Airbnb when shown and asked about Applicant's SOUL BNB Mark, as compared to 1.0% of the Control Group respondents who were shown and asked about the SOUL STAY mark. Thus, "[t]he net confusion level between the Test Cell and the Control Cell [was] 17%." Based on this figure, Dr. Neal opined that the survey "clearly supports a conclusion that there is a significant likelihood of confusion with Opposer caused by Applicant's SOUL BNB Mark, in connection with health spa services for health and wellness of the mind, body and spirit offered in or from a getaway at a remote location, a mobile location, or at a temporary on-site location."[74]

Opposer also asserts that "survey respondents' verbatim responses to the questions in Dr. Neal's survey confirm that confusion is likely specifically because Applicant's SOUL BNB Mark includes Airbnb's distinctive BNB suffix."[75] These responses were prompted by a question asking respondents to describe, "[f]or each company or brand you named (listed below), . . . what makes you think they are affiliated with, or connected to, the company or brand that puts out the listed services

---

[74] Opposer's Brief, 25 TTABVUE 41-42 (quoting Testimony Declaration of David Neal, 17 TTABVUE). Dr. Neal's testimony that "there is a significant likelihood of confusion" is a legal conclusion, which is entitled to little weight. *See Mennen Co. v. Yamanouchi Pharm. Co.*, 1979 TTAB LEXIS 38, at *7 ("[T]he opinions of witnesses, including those qualified as expert witnesses, on the question of likelihood of confusion are entitled to little if any weight and should not be substituted for the opinion of the tribunal charged with the responsibility for the ultimate opinion on the question.") (no number in original); *Edwards Lifesciences Corp. v. VigiLanz Corp.*, No. 91154210, 2010 TTAB LEXIS 84, at *1 ("[W]e will not substitute the opinion of a witness, even an expert witness, for our evaluation of the facts.").

[75] Opposer's Brief, 25 TTABVUE 43.

Opposition No. 91288785

using the name above."[76] For those respondents who mentioned AIRBNB as the brand that offered services under SOUL BNB, the responses to the query included the following:

- "They used the same bnb language";[77]

- "They probably have a trademark on bnb";[78]

- "This makes me think this because of the BNB in the name. Also because if someone was looking to book a spa or something Air BNB would be the right place";[79]

- "The BNB portion of the brand";[80]

- "The use of the moniker BnB, it's a hallmark of the brand";[81] and

- "[S]imilar name to AIRBNB."[82]

Dr. Neal explains in his report that when formulating the survey questions, he "included a reference to 'getaways' in the description of services to ensure [he] fairly and accurately captured Applicant's consumer-facing language concerning its services."[83] In other words, based on advertising copy on Applicant's website, Dr. Neal determined that Applicant's services included a "getaway" element. However, as explained above, our assessment must be based on the services as they are identified

---

[76] Testimony Declaration of David Neal, 17 TTABVUE 36-37.

[77] *Id.* at 82.

[78] *Id.* at 84.

[79] *Id.* at 85.

[80] *Id.* at 90.

[81] *Id.* at 91.

[82] *Id.*

[83] *Id.* at 9.

40

Opposition No. 91288785

in Applicant's application, and there is no mention of the services being provided "in or from a getaway." Again, the identification merely states that Applicant's health spa services may be "offered in a or from a remote, mobile or temporary on-site location."

Because the term "getaway," refers to "a vacation especially of brief duration,"[84] its inclusion in the description services does not, in fact, correctly characterize the nature of Applicant's identified services, despite Dr. Neal's stated intentions. Consequently, the inclusion of "getaway" may have predisposed survey respondents to think of Opposer and its AIRBNB-branded services, which can be used to plan short "getaway" trips, and thus skewed the responses. In fact, one of the survey respondents who thought AIRBNB was associated with the services offered under SOUL BNB stated that they thought so "[b]ecause it's a get away [sic] were [sic] you tend to stay."[85] And several other respondents, regardless of whether they identified AIRBNB, mentioned the "getaway" aspect of the services when explaining their answers.[86] We therefore strongly suspect the survey results would have been markedly different if Applicant's services had been correctly characterized and, for that reason, we find the survey is entitled to little probative weight.

---

[84]  MERRIAM-WEBSTER  DICTIONARY,  https://www.merriam-webster.com/dictionary/getaway (accessed on January 28, 2026).

[85] Testimony Declaration of David Neal, 17 TTABVUE 82.

[86] *See, e.g., id.* at 81-82, 85, 87.

Opposition No. 91288785

Putting aside this flaw, we acknowledge that a number of respondents seem to have assumed the AIRBNB brand "puts out"[87] Applicant's SOUL BNB-branded services because of the marks' shared BNB element. However, other respondents were more ambiguous about their reasons for naming AIRBNB. For example, one stated that AIRBNB was the "only[] company I can think of,"[88] which could be interpreted as indicating that they were focused on the described services and were simply trying think of a company that could provide such services. Another states that "I feel like the model is the same as Airbnb but the services are slightly different,"[89] which, again, focuses more on the services being offered than on the marks at issue. A different respondent explains that "they are most associated,"[90] which may indicate that the respondent believes the AIRBNB brand to be the most associated with the named services, but not necessarily that AIRBNB identifies the source of the services or that there would be confusion between AIRBNB and SOUL BNB. Another response simply states "similar company [sic] bed and breakfast company,"[91] which, is unclear, but suggests that the respondent recognizes the element BNB as referring to bed-and-breakfast services. Lastly, one respondent's explanation was "[b]ecause it says BNB, and they usually offer those services,"[92]

---

[87] *Id.* at 37.

[88] *Id.* at 82.

[89] *Id.* at 89.

[90] *Id.* at 83.

[91] *Id.* at 86.

[92] *Id.*

42

Opposition No. 91288785

which Opposer credits as referring to AIRBNB.[93] However, that respondent actually named "Bed and breakfast" as the provider of the services,[94] not AIRBNB.

In addition, some of the respondents who named AIRBNB as the provider of the services (survey question #4), also named other brands, including SOUL BNB, Priceline, VRBO, and SOUL STAY (the survey's control mark).[95] One stated "[a] hotel" in addition to AIRBNB.[96] And we count 31 respondents who, in their first text response to question #4, named SOUL BNB the provider of the services versus 32 respondents who named AIRBNB in their first text response.[97] Based on Dr. Neal's explanation of the survey, most of the responses referencing either SOUL BNB or AIRBNB in question #4 appear to be from respondents in the survey's test group, meaning that the number of respondents who identified SOUL BNB as the provider of the services in response to the question was roughly equal to the number who identified AIRBNB.

In sum, in view of the flawed survey question based on an inaccurate description of Applicant's services, as well as the ambiguity of some of the survey responses, we find that the survey falls far short of Opposer's claim that it shows a "significant

---

[93] *See* Opposer's Brief, 25 TTABVUE 33.

[94] Testimony Declaration of David Neal, 17 TTABVUE 89.

[95] *See id.* at 82, 85, 86,

[96] *Id.* at 89.

[97] Dr. Neal's report indicates there were 36 total responses indicating "that Applicant's SOUL BNB Mark was put out by, had an affiliation or connection with, or needed to get permission or approval from Opposer, Airbnb." *See id.* at 14. We presume that the difference between our count and Dr. Neal's is explained by (1) our count being limited to those respondents who, in response to question #4 in the survey, indicated AIRBNB in their first text response and (2) Dr. Neal's count reflecting responses to multiple questions in the survey.

Opposition No. 91288785

likelihood of confusion" between the marks. But the survey does provide some indirect evidence of actual confusion on the part of some consumers. Thus, while Opposer overstates the probative value of the survey, we find that the seventh *DuPont* factor weighs slightly in favor of a conclusion that confusion is likely.

## V.  Conclusion

Having reviewed all of the evidence and arguments as they apply to the relevant *DuPont* factors, we find that the parties' respective services, as identified in Applicant's application and Opposer's registrations (particularly the services in Registration Nos. 3890027 and 4884815), are related, and are sold through the same trade channels and encountered by the same classes of consumers. We also find that, despite significant flaws in the surveys submitted by Opposer, the record demonstrates that the AIRBNB mark falls on the higher end of the commercial strength spectrum and that there is at least some circumstantial evidence that a portion of the relevant consumers could be confused by the respective marks.

However, this is a case where the first *DuPont* factor is dispositive, because the differences between the marks in sound, appearance, and overall commercial impression outweigh the minimal amount of similarity created by the shared term BNB. *See Boston Red Sox Baseball Club LP v. Sherman*, No. 91172268, 2008 TTAB LEXIS 67, at *29 ("In appropriate cases, a single du Pont factor may be dispositive of the likelihood of confusion analysis.") (citing C*hampagne Louis Roederer*, 148 F.3d at 1375; *Kellogg Co. v. Pack'Em Enters.*, No. 91080586, 1990 TTAB LEXIS 3, at *15, *aff'd*, 951 F.2d 330 (Fed. Cir. 1991)). In short, despite the commercial strength of AIRBNB as a whole, we find the element BNB will be recognized by consumers as

44

Opposition No. 91288785

equivalent to B&B (or variations thereof), a term that is highly suggestive, if not descriptive, of Opposer's services and thus has very little significance as a distinctive feature of Opposer's mark. Therefore, although BNB is common to the parties' marks, this shared element is unlikely to lead consumers to mistakenly believe that the overall marks, AIRBNB and SOUL BNB, identify the same source when used in connection with the parties' respective services. Accordingly, Opposer has failed to satisfy its burden to show, by a preponderance of the evidence, that confusion as to source is likely.

**Decision:** The opposition to registration of Applicant's **SOUL BNB** mark, based on a likelihood of confusion under Trademark Act Section 2(d), is **dismissed**.

45